T.C. Memo. 2014-136

UNITED STATES TAX COURT

RONALD R. DICKINSON AND SHIRLEY F. DICKINSON, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19828-11.                    Filed July 10, 2014.

Ronald R. Dickinson and Shirley F. Dickinson, pro sese.

Nathan M. Swingley, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  Respondent determined a deficiency of $15,496 in

petitioners' Federal income tax for their taxable year 2007.

**[\*2]** The issue for decision[1] is whether petitioner Ronald R. Dickinson is entitled to deduct for his taxable year 2007 a claimed business bad debt of $32,550. We hold that he is not.

FINDINGS OF FACT

Petitioner Ronald R. Dickinson (Mr. Dickinson) and respondent stipulated some of the facts herein, and those facts are so found.[2]

Petitioners resided in Indiana at the time they filed the petition.

At all relevant times, Mr. Dickinson was a self-employed consultant. On a date in 1998 not established by the record, Mr. Dickinson retained Terry DuPont (Mr. DuPont), who had previously worked for Mr. Dickinson in Indianapolis (Mr. DuPont's prior employment), to work for him again in a new consulting business that Mr. Dickinson had decided to start and that was to serve primarily small banks. Mr. DuPont had ended Mr. DuPont's prior employment because he had

---

[1]In addition to the issue for decision for petitioners' taxable year 2007 that is stated in the text, there are other questions relating to certain determinations in the notice of deficiency for that year that are computational in that their resolution flows automatically from our resolution of the issue that we address herein.

[2]Petitioner Shirley F. Dickinson (Ms. Dickinson) did not sign the stipulation of facts between respondent and Mr. Dickinson and did not appear at the trial in this case. Respondent filed a motion to dismiss for lack of prosecution as to her. We shall grant that motion and shall enter a decision with respect to Ms. Dickinson that is the same as the decision that we shall enter with respect to Mr. Dickinson.

**[*3]** decided to move to Illinois to be near his children, who were living there with their mother after Mr. DuPont and she had divorced. When Mr. Dickinson decided that he wanted to retain Mr. DuPont again in 1998, he was aware that Mr. DuPont had certain financial obligations to his former spouse and to his children and that he was experiencing certain financial problems as a result of those and certain other financial obligations.

At all relevant times, Mr. Dickinson maintained two bank accounts at National City Bank, the account number for one of which ended in 9732 (account 9732) and the account number for the second of which ended in 8677 (account 8677). Between August 3, 1998, and January 3, 2002, Mr. Dickinson wrote certain checks on account 9732 that totaled $24,307.29 and that were payable to Mr. DuPont. Between October 26, 1998, and December 4, 2000, Mr. Dickinson wrote certain checks on account 8677 that totaled $2,700 and that were payable to Mr. DuPont. (We shall refer collectively to the checks that Mr. Dickinson wrote on account 9732 and account 8677 that totaled $27,007.29 and that were payable to Mr. DuPont as the DuPont funds.)

On July 11, 1998, before writing any checks on account 9732 and account 8677 that were payable to Mr. DuPont, Mr. Dickinson sent a letter to Mr. DuPont (the July 11, 1998 letter) that stated in pertinent part:

**[*4]**   Terry [Mr. DuPont], I want to tell you once again, I am quite excited to get you over here and get our operation started together. * * * From my initial marketing efforts, you can fulfill the areas I cannot achieve by myself * * *. Anyway, I want to reiterate again my commitment to you financially, and what I would expect from you in paying me back. I am not going to prepare a note, or any form of contract, because I trust you to be honest about this matter, just like all of the other people I have loaned money.

Anyway, I agree to loan you money to get settled in over here, and help you out financially as long as I see our new company is working, and you are going to work as hard as you did for me the last time we worked together. As we discussed, we will be equal partners on all business produced, once you are here and we begin to produce business. * * * I know I cannot loan you a tremendous amount of money * * *. On the other hand, I already have enough small banks willing to refer their customers to us for financial planning and the sales of pensions, securities and insurance products, so I don't think it will take you too long to get rolling again. In analyzing the way things have been going for me up until now. I would expect you to be cranking out your own commissions within 70 to 90 days. * * *

Mr. DuPont did not execute a promissory note or a similar document with respect to any of the DuPont funds evidencing that Mr. Dickinson had made loans to Mr. DuPont of any of those funds that Mr. DuPont was obligated to repay. Mr. Dickinson did not charge Mr. DuPont any interest on any of the DuPont funds and did not require repayment of any of those funds pursuant to a fixed repayment schedule. Nor did Mr. Dickinson require Mr. DuPont to provide any collateral with respect to any of the DuPont funds.

**[*5]**   On certain dates not established by the record after Mr. DuPont started working for Mr. Dickinson in 1998, Mr. DuPont withdrew certain funds that he was not authorized to withdraw from one or more bank accounts over which he and Mr. Dickinson had signatory authority.  On certain other dates not established by the record, Mr. DuPont deposited certain funds that he was not authorized to deposit into one or more of his bank accounts.  (We shall refer collectively to the funds that Mr. DuPont withdrew or deposited without authority as the additional DuPont funds.)[3]  Mr. DuPont did not execute a promissory note or a similar document with respect to any of the additional DuPont funds evidencing that Mr. Dickinson had made loans to Mr. DuPont of any of those funds that Mr. DuPont was obligated to repay.  Mr. Dickinson did not charge Mr. DuPont any interest on any of the additional DuPont funds and did not require repayment of any of those additional funds pursuant to a fixed repayment schedule.  Nor did Mr. Dickinson require Mr. DuPont to provide any collateral with respect to any of the additional DuPont funds.

On February 11, 2002, Mr. Dickinson and Mr. DuPont formed a limited liability company under the laws of the State of Indiana known as Heritage Wealth

---

[3]We shall sometimes refer collectively to the DuPont funds and the additional DuPont funds as the DuPont funds in question.

[*6] Resources, LLC (Heritage). Mr. Dickinson and Mr. DuPont were shown as members of Heritage in the operating agreement for that company that they signed. Heritage was in the business of offering and marketing financial advice and counseling and selling insurance products. Sometime in 2003, Mr. Dickinson and Mr. DuPont ended their business relationship.

On July 7, 2004, Mr. Dickinson and Heritage, as plaintiffs, filed a verified complaint against Mr. DuPont and Roberta E. Lauderback (Ms. Lauderback), as defendants, in the Marion Circuit Court in Indianapolis, Indiana (Marion Circuit Court). (We shall refer to the lawsuit that Mr. Dickinson and Heritage commenced by filing the verified complaint in the Marion Circuit Court as the Dickinson lawsuit.) In the complaint that they filed commencing the Dickinson lawsuit, Mr. Dickinson and Heritage alleged that during the period that started around August 1, 1998, and ended January 2, 2002, Mr. DuPont had requested, and Mr. Dickinson had advanced to Mr. DuPont, funds totaling approximately $33,000 (alleged funds advanced). They further alleged in that complaint that the alleged funds advanced constituted loans that Mr. DuPont was obligated to repay.

Mr. DuPont and Ms. Lauderback filed an answer and counterclaim to the verified complaint in the Dickinson lawsuit. In that answer and counterclaim, Mr. DuPont and Ms. Lauderback admitted that during the period alleged in that

**[\*7]** complaint Mr. Dickinson "did on occasion write checks payable to [Mr.] DuPont", but they denied that the alleged funds advanced totaled $33,000 and that any such funds were advanced to Mr. DuPont upon Mr. DuPont's request. They further denied in the answer and counterclaim to the verified complaint in the Dickinson lawsuit that the alleged advanced funds constituted loans that Mr. DuPont was obligated to repay.

The Dickinson lawsuit was still pending at the end of 2007.

On January 18, 2008, the secretary of state of Indiana administratively dissolved Heritage.

On April 2, 2009, the Marion Circuit Court dismissed the Dickinson lawsuit.

On October 16, 2008, petitioners filed Form 1040, U.S. Individual Income Tax Return, for petitioners' taxable year 2007 (2007 return). Petitioners attached to their 2007 return Schedule C, Profit or Loss From Business (2007 Schedule C).

In petitioners' 2007 Schedule C, Mr. Dickinson showed his "Principal business or profession" as "Insurance". In that Schedule C, petitioners reported "Gross receipts or sales" of $64,549 and deducted, inter alia, a claimed business bad debt of $32,550 (2007 claimed business bad debt).

**[\*8]** Petitioners attached to their 2007 return a letter dated October 11, 2008, that Mr. Dickinson signed and addressed to the Internal Revenue Service and that was regarding "Unpaid debt from Terry Du[P]ont". That letter stated in pertinent part:

> I have finally given up in attempting to collect money I loaned Mr. Terry Dupont. Mr. Dupont came to work with me back in 1997, and immediately needed to borrow some money, which I was glad to loan to him. That year, and the next few years after, he was always just short on extra funds to repay me. * * * We eventually formed a company together, and opened up a company bank account, which was to require both of our signatures on every check. Unfortunately, Terry went to the bank and acquired a debit card for the account. . . . which I did not know about! At that time, Terry began taking money from the account every time he needed funds. * * * Finally, I reviewed the bank records, and the credit card he was carrying, and realized I was just letting him steal me blind!

> I terminated our relationship in 2002, and filed suit against Terry in 2003. Our respective attorneys had 2 or 3 meetings without Terry or me being present. No agreement could be worked out on the amount of money Terry owed me, because he had shown his attorney who knows what? * * * [T]hen Terry vanished!

> I have finally elected to claim only the cancelled checks I wrote to Terry at the beginning of our relationship. Because I really could not prove to you the money he took from the company (which is about $40,000.00 by my calculations), I will assume I just need to count this as an expensive lesson! * * *

> I am sorry I must turn this in as a bad debt, but, it just seems I was not supposed to win this battle, after all of these years, and all of the added money I spent on legal fees and court costs!

[*9]   On June 13, 2011, respondent issued to petitioners a notice of deficiency (notice) with respect to their taxable year 2007.  In that notice, respondent determined, inter alia, to disallow the deduction that petitioners had claimed in their 2007 Schedule C for the 2007 claimed business bad debt of $32,550.  In support of that determination, respondent determined in the notice:

> The deduction of $32,550.00 shown on your 2007 return as a Sched-
> ule C Bad Debt Deduction is not allowed since you have not estab-
> lished that any amount was incurred for a bona fide debt which
> became worthless during the year.  In addition, since you are a cash
> basis taxpayer the loss is not allowed unless first included in income.
> Therefore, your taxable income is increased $32,550.00 for 2007.

## OPINION

Mr. Dickinson bears the burden of establishing that the determinations in the notice are erroneous.  See Rule 142(a);[4] Welch v. Helvering, 290 U.S. 111, 115 (1933).  Moreover, deductions are a matter of legislative grace, and Mr. Dickinson bears the burden of proving entitlement to any deduction claimed.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  The Code and the regulations thereunder required Mr. Dickinson to maintain records sufficient to establish the

---

[4]All Rule references are to the Court's Rules of Practice and Procedure.  All section references are to the Internal Revenue Code (Code) in effect for the year at issue.

[*10] amount of any deduction claimed.  See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

It is Mr. Dickinson's position that the DuPont funds in question were loans that he made to Mr. DuPont and that became worthless in 2007.  According to Mr. Dickinson, those worthless loans constitute bad debts that are not nonbusiness bad debts under section 166(d)(2) and that are deductible under section 166(a) for his taxable year 2007.

Only a bona fide debt qualifies as debt for purposes of section 166.  A bona fide debt is a debt that arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Sec. 1.166-1(c), Income Tax Regs.  Whether a bona fide debtor-creditor relation-ship exists is a question of fact to be determined upon a consideration of all the pertinent facts and circumstances.  See Fisher v. Commissioner, 54 T.C. 905, 909 (1970).

In order for a transfer of funds to constitute a loan and thus a bona fide debt for purposes of section 166, at the time the funds are transferred there must be an unconditional obligation (i.e., an obligation that is not subject to a condition precedent) on the part of the transferee to repay, and an unconditional intention on the part of the transferor to secure repayment of, such funds.  Haag v. Commis-

**[*11]** sioner, 88 T.C. 604, 616 (1987), aff'd without published opinion, 855 F.2d 855 (8th Cir. 1988); see also Frierdich v. Commissioner, 925 F.2d 180, 185 (7th Cir. 1991), aff'g T.C. Memo. 1989-393; Clark v. Commissioner, 18 T.C. 780, 783-784 (1952), aff'd per curiam, 205 F.2d 353 (2d Cir. 1953).  Whether a transfer of funds constitutes a loan may be inferred from objective characteristics surrounding the transfer, including the presence or absence of a debt instrument, collateral securing the purported loan, interest accruing on the purported loan, repayments of the funds transferred, a fixed schedule for repayments of the funds transferred, and any other attributes indicative of an enforceable obligation to repay the funds transferred.  See, e.g., Haag v. Commissioner, 88 T.C. at 615-616 & n.6; Clark v. Commissioner, 18 T.C. at 783.  Another factor to be considered is whether the alleged borrower has the ability to repay the alleged loan at the time the alleged lender transfers the funds.  See Jewell Ridge Coal Corp. v. Commissioner, 318 F.2d 695, 699 (4th Cir. 1963), aff'g T.C. Memo. 1962-194.

In order for all or a portion of a loan to be deductible as a bad debt under section 166(a), the loan (1) must become either wholly or partially worthless in the year for which a deduction is claimed, sec. 166(a), and (2) must constitute (a) a debt created or acquired in connection with a trade or business or (b) a debt the

**[*12]** loss from the worthlessness of which is incurred in the taxpayer's trade or business, sec. 166(d)(2).

We consider initially whether, as Mr. Dickinson maintains, all of the DuPont funds in question constituted loans by him to Mr. DuPont and thus bona fide debts for purposes of section 166. In support of his position, Mr. Dickinson relies on his testimony that pursuant to his general practices he (1) made one or more loans to any person who wanted money from him and who agreed to work for him and (2) did not require a written loan agreement evidencing any such loan that was signed by that person (Mr. Dickinson's general practices).[5] In support of

---

[5]With respect to Mr. Dickinson's general practices, Mr. Dickinson testified:

Over the years I got into the insurance business and had between 20 and 35 people working for me. And at that time, over the years, people would need money; and I'd loan it to them. * * *

\*     \*     \*     \*     \*     \*     \*

When they came into the business, it was treated as a business loan because what they spent the money on was to buy equipment, things of that nature. And most of them that came into the business were young college grads or people that didn't have a lot of money, and I was fortunate to build up some cash and I loaned it out.

And I kept it in a little spiral ring notebook, because, again, I didn't use notes * * *. And so consequently, without having any notes * * * I wrote a letter * * * to basically everybody [to whom I had loaned money].

**[*13]** his position that all of the DuPont funds in question constituted loans by him to Mr. DuPont, Mr. Dickinson also relies on the July 11, 1998 letter that he sent to Mr. DuPont.[6]

With respect to Mr. Dickinson's general practices about which he testified, we are unwilling to rely on that uncorroborated testimony in order to find that the DuPont funds in question constituted loans from Mr. Dickinson to Mr. DuPont and thus bona fide debts for purposes of section 166.

With respect to the July 11, 1998 letter that we believe pertains only to the DuPont funds and not to the additional DuPont funds that Mr. DuPont obtained without authority, it appears from our reading of that letter that Mr. Dickinson may have wanted Mr. DuPont to repay the DuPont funds. However, the record is devoid of evidence establishing that at the times Mr. Dickinson wrote the various checks that were payable to Mr. DuPont Mr. Dickinson had an unconditional intention to secure repayment of any such funds. The record also is devoid of

---

[6]With respect to the July 11, 1998 letter, Mr. Dickinson testified:

Well, in the [July 11, 1998] letter was a -- basically standard words that I used with everyone over maybe 30 or 40 people that I had loaned money to in the business. And it said in there I will loan you money. * * * And so consequently, that was a business loan in my mind * * * because if they were successful, then the business was more successful; and that's the way I always treated it.

[*14] evidence that at the times Mr. Dickinson wrote the various checks that were payable to Mr. DuPont Mr. DuPont intended, let alone had an unconditional obligation, to repay any of the DuPont funds.

The record also is devoid of evidence establishing any of the following objective factors that would support Mr. Dickinson's position that the DuPont funds and the additional DuPont funds, i.e., all of the DuPont funds in question, constituted loans by Mr. Dickinson to Mr. DuPont:  the existence of one or more promissory notes or similar documents signed by Mr. DuPont evidencing his obligation to repay the DuPont funds in question; interest on the alleged loans; the existence of collateral securing the alleged loans; a fixed repayment schedule for the alleged loans; and repayment by Mr. DuPont of a portion of the alleged loans.

It also is significant in our determination of whether the DuPont funds constituted loans by Mr. Dickinson to Mr. DuPont and thus bona fide debts for purposes of section 166 that at the times Mr. Dickinson wrote the checks that were payable to Mr. DuPont and that constitute the DuPont funds he was aware of certain financial problems that Mr. DuPont was experiencing.  On the record before us, we find that at the times Mr. Dickinson wrote the checks that were payable to Mr. DuPont and that constitute the DuPont funds Mr. Dickinson did not

**[*15]** have a reasonable expectation that he would be able to recover from Mr. DuPont any portion of those funds.

Based upon our examination of the entire record before us, we find that Mr. Dickinson has failed to carry his burden of establishing that the DuPont funds in question constituted loans by Mr. Dickinson to Mr. DuPont and thus bona fide debts for purposes of section 166.[7] On that record, we further find that Mr. Dickinson has failed to carry his burden of establishing that he is entitled to deduct

---

[7]Assuming arguendo that Mr. Dickinson had satisfied his burden of establishing that the DuPont funds in question constituted loans by him to Mr. DuPont and thus bona fide debts for purposes of sec. 166, on the basis of the record before us, we would find that he has failed to carry his burden of establishing that those alleged bad debts constitute bad debts that are not nonbusiness bad debts. See sec. 166(d); sec. 1.166-5(b), Income Tax Regs. In this connection, Mr. Dickinson has failed to show that the alleged bad debts were created or acquired in connection with a trade or business of his or that the losses from the worthlessness of the alleged bad debts were incurred in a trade or business of his. See sec. 166(d); sec. 1.166-5(b), Income Tax Regs.

In addition, assuming arguendo that Mr. Dickinson had satisfied his burden of establishing that the DuPont funds in question constituted loans by him to Mr. DuPont and thus bona fide debts that are not nonbusiness bad debts, on the basis of the record before us, we would find that he has failed to carry his burden of establishing that those alleged nonbusiness bad debts became either wholly or partially worthless in taxable year 2007, the year for which petitioners claimed the deduction for those alleged business bad debts. In this connection, Mr. Dickinson has failed to show any identifiable events that could have formed the basis for his having reasonable grounds as of the end of 2007 for his abandoning any hope of recovering the DuPont funds in question. See Crown v. Commissioner, 77 T.C. 582, 598 (1981). In fact, the record establishes that Mr. Dickinson continued after 2007 to prosecute the Dickinson lawsuit in order to recover those funds until the Marion Circuit Court dismissed that lawsuit in 2009.

**[*16]** under section 166(a) any of the DuPont funds in question.

We have considered all of the parties' respective contentions and arguments that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>An order granting respondent's motion to dismiss for lack of prosecution as to petitioner Shirley F. Dickinson and decision for respondent will be entered</u>.