T.C. Memo. 2017-127

UNITED STATES TAX COURT

ELLIS J. SALLOUM AND MARY VIRGINIA H. SALLOUM, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17709-15.                                 Filed June 29, 2017.

James G. McGee, Jr., for petitioners.

Clint J. Locke and Thomas A. Friday, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  Respondent determined a deficiency in, and an accuracy-related penalty under section 6662(a)[1] on, petitioners' Federal income tax (tax) for their taxable year 2012 of $16,923 and $3,384.60, respectively.

---

[1]All section references are to the Internal Revenue Code (Code) in effect for the year at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*2]** The issues for decision for petitioners' taxable year 2012 are:

(1) Does the $146,500 that Centerpoint Medical Center of Independence, LLC d.b.a. Centerpoint Medical Center, transferred to petitioner Ellis J. Salloum during 2009 constitute a loan? We hold that it does.

(2) Are petitioners liable for the accuracy-related penalty under section 6662(a)? We hold that they are.

FINDINGS OF FACT

All of the facts in this case, which the parties submitted under Rule 122, have been stipulated by the parties and are so found.

Petitioners resided in Mississippi at the time they filed the petition.

At a time not established by the record, Centerpoint Medical Center of Independence, LLC d.b.a. Centerpoint Medical Center (CMC), was engaged in recruiting petitioner Ellis J. Salloum[2] to join their medical practice as a vascular surgeon. CMC's recruiting efforts were successful. On April 23, 2009, CMC and petitioner entered into an agreement pursuant to a document titled "PHYSICIAN RECRUITING AGREEMENT" that comprised five documents, including a document titled "RECRUITING AGREEMENT". (We shall sometimes refer to

---

[2]Unless otherwise stated, our references to petitioner are to petitioner Ellis J. Salloum.

**[*3]** all five of the documents included in the document titled "PHYSICIAN RECRUITING AGREEMENT" as the physician's recruiting agreement. We shall refer to the document titled "RECRUITING AGREEMENT" that is part of the physician's recruiting agreement as the recruiting agreement.) Petitioner signed each of the five documents that were included in the physician's recruiting agreement except the document titled "INTERNAL CERTIFICATION", which was signed by certain representatives of CMC.

CMC and petitioner agreed in the physician's recruiting agreement that (1) petitioner was to join CMC's medical practice in Independence, Missouri, for a period of at least 36 months during which he was to engage in the private practice of medicine as a vascular surgeon; (2) petitioner was to work in CMC's medical practice as an independent contractor; and (3) CMC was to loan to petitioner $146,500 to be advanced in monthly installments over a period of six months and that loan was to be evidenced by a promissory note.[3]

One of the documents that is part of the physician's recruiting agreement was titled "COMPENSATION GUARANTEE WITH FORGIVENESS". That document incorporated by reference and had attached to it another document titled

---

[3]In the first stipulation of facts, the parties consistently described the transfer by CMC to petitioner of $146,500 as a "loan" to him and as the "$146,500 loan". We shall sometimes do the same.

**[*4]** "PROMISSORY NOTE". (We shall sometimes refer to the document titled "COMPENSATION GUARANTEE WITH FORGIVENESS" as the compensation guarantee with forgiveness agreement. We shall refer to the document titled "PROMISSORY NOTE" that was incorporated by reference in the compensation guarantee with forgiveness agreement and attached thereto as the promissory note.) Petitioner not only signed the compensation guarantee with forgiveness agreement, he also signed the promissory note. The recruiting agreement, the compensation guarantee with forgiveness agreement, and the promissory note set forth the agreements of CMC and petitioner with respect to, inter alia, the $146,500 that CMC agreed to loan to petitioner. (We shall sometimes refer collectively to the provisions of the recruiting agreement, the compensation guarantee with forgiveness agreement, and the promissory note that set forth the agreements of CMC and petitioner with respect to the $146,500 that CMC agreed to transfer to him as the agreement with respect to the $146,500 transfer to petitioner.)

The recruiting agreement provided in pertinent part that petitioner "agrees to engage in the private practice of medicine as a/an Vascular Surgeon in the Community on a full-time permanent basis for at least thirty-six (36) months after Physician [petitioner] commences said private practice of medicine". The recruit-

[*5] ing agreement further provided in pertinent part that CMC was to report in Form 1099-MISC, Miscellaneous Income (Form 1099-MISC), any compensation that petitioner received, regardless of whether he received cash compensation from CMC or compensation from CMC as a result of the "forgiveness of amounts owed" by petitioner to CMC.

The compensation guarantee with forgiveness agreement and the promissory note provided in pertinent part that petitioner was obligated to repay to CMC the $146,500 that it agreed to, and did, loan to him. The compensation guarantee with forgiveness agreement provided in pertinent part:

> A. Hospital [CMC] hereby agrees to loan Physician [petitioner] certain amounts of money which Hospital shall advance as a guarantee of compensation for Physician totaling a maximum of $146,500.00 (hereinafter the "Guarantee Amount"). For purposes of the Recruiting Agreement and any Addenda thereto, the Guarantee Amount shall be limited to the salary paid to, or incurred on behalf of, Physician. The parties agree and have verified that the Guarantee Amount represents no more than fair market value for Physician's speciality in the Community.
>
> B. The Guarantee Amount shall be paid over a period of six (6) months * * * ("Guarantee Period") in monthly installments ("Guarantee Payments") * * *
>
> *       *       *       *       *       *       *
>
> E. Physician agrees to actively engage in the full-time practice of medicine in the Community and geographic area served by Hospital, to bill all patients and third-party payors promptly for all services

[*6] rendered, and to use his/her best efforts to collect all patient accounts. Hospital shall have the right to review and audit Physician's books and records for whatever period of time is necessary to assure compliance with the Recruiting Agreement and any Addenda thereto.

F.  At the end of the Guarantee Period, the sum of all Guarantee Payments made by Hospital to Physician during the Guarantee Period, not otherwise repaid or recouped pursuant to any other provision in this Addendum [compensation guarantee with forgiveness agreement], shall be calculated.  This amount represents the "Loan Repayment Amount" which shall be due and payable by Physician as evidenced by the attached Promissory Note (Exhibit "A") executed by Physician.  Although not included in the Loan Repayment Amount, additional amounts may be due from Physician to Hospital in accordance with the terms of the Addenda attached and made a part of the Recruiting Agreement.  Interest on the Loan Repayment Amount will begin to accrue at the end of the Guarantee Period.  However, in an effort to encourage prompt payment, interest will be forgiven on any amounts repaid within six (6) months of the end of the Guarantee Period.  Amounts so forgiven, if any, (as well as any imputed income as required by law) will be reported on Form 1099 as prescribed by the Internal Revenue Service.

G.  Notwithstanding, in recognition of the fact that Physician is establishing his/her full-time medical practice in the Community and geographic area served by Hospital and to encourage Physician to remain in the Community and geographic area served by Hospital beyond the Guarantee Period, Hospital agrees to forgive and cancel **one thirtieth** (1/30th) of Physician's Loan Repayment Amount as calculated above to Hospital for each calendar month after the end of the Guarantee Period that Physician (1) remains in the full-time practice of medicine in the Community and geographic area served by Hospital, (2) maintains Medical Staff membership and privileges in good standing at Hospital, and (3) remains available for emergency room coverage for patients of Hospital's emergency room.  Amounts forgiven, if any, (as well as any imputed income as required by law) will be reported on Form 1099 as prescribed by the Internal Revenue

**[*7]**  Service.  Amounts paid in error to the physician will not be subject to forgiveness.

H.  Any failure by Physician to comply with the terms of Paragraph E of this Addendum shall be considered a material breach of this Addendum and the Recruiting Agreement by Physician and shall authorize Hospital, at its option, to pursue the remedies described in the <u>Material Breach</u> Section of the Recruiting Agreement.

The promissory note provided in pertinent part:

FOR VALUE RECEIVED, the undersigned, Ellis Salloum, MD ("Physician" or "Maker"), hereby promises to pay, according to the terms of this Note, to * * * [CMC] any and all amounts as are actually advanced to Physician which is referenced to as the "Loan Repayment Amount" in the attached Recruiting Agreement Addendum, pursuant to the terms of the Physician Recruitment Agreement dated March 10, 2009 between the Hospital and Physician (the "Agreement") to which this Note is attached hereto and in which it is referred to as Exhibit A (which provisions are incorporated by reference herein) together with interest at the rate per annum equal to the lower of prime as reported in the money market rates section of the <u>Wall Street Journal</u> on the date provided above plus one percent (1%) or the maximum rate permitted by law.  Interest on the Loan Repayment Amount will begin to accrue at the end of the Guarantee Period.  However, interest will be forgiven on any amounts repaid within six (6) months of the end of the Guarantee Period.  This forgiven amount, if any, will be reported on Form 1099 as prescribed by the Internal Revenue Service.

Amounts outstanding under this Note are subject to forgiveness but shall become due and payable if Physician shall fail at any time during the Commitment Period (as defined in the Agreement and incorporated by reference herein) to fulfill his/her obligations set forth in the Agreement, and such default shall continue for a period of 10 days after the defaulting party receives written notice thereof from

**[*8]** the other party specifying the existence of such default and the defaulting party has not commenced a cure of such compliance and demonstrated continued diligent pursuit of such cure after notice of default. In the event that Physician does default on his/her obligations set forth in the Agreement, the Hospital may, at its option, accelerate any outstanding debt to be immediately due and payable by the Physician.

Amounts so payable, and interest, shall be payable in thirty-six (36) equal monthly installments, the first such payment to be paid on the first business day of the month following receipt of written notice that amounts are due hereunder, and subsequent installments to be paid on the same day of each succeeding calendar month until all amounts have been paid. The Maker may prepay, without premium or penalty, all or any part of this Note at any time and from time to time. All payments shall be payable in lawful money of the United States.

As security for the payment of principal and interest on this Note, Maker hereby irrevocably grants to Holder a security interest in, and irrevocably assigns to Holder, all accounts receivable of Maker's private practice of medicine, whether now existing or hereafter arising (but excluding those for goods or services to be paid for under any federal or state insurance or reimbursement program that prohibits assignment of such receivables), to secure Maker's payment and performance of this Note, including, without limitation, payment of all principal and interest on this Note. Maker hereby agrees to permit Holder to make regular audits of Maker's accounts receivable balances. Maker acknowledges and agrees that Holder may file a UCC-1 Financing Statement to perfect Holder's security interest in Maker's accounts receivable.

If any of the Events of Default described below shall occur, Maker immediately shall give to Holder and permit Holder to collect all accounts receivable then existing or thereafter arising from Maker's private practice of medicine until all Events of Default are cured, and Maker also shall cooperate by endorsing and delivering to Holder all checks and other payments from Maker's accounts receivable.

[*9]    Maker warrants and represents to Holder that Maker will not grant any security interests in or assign such accounts receivable to any other person or entity during the term of this Note.  Maker further warrants and represents to Holder that except for the security interest granted by Maker to (list here all prior holders of a security interest, if any, in the accounts receivable) _____ [left blank in the promissory note that is part of the record] such accounts receivable presently are not subject to any security interest of any other creditor.

If at any time during the term of this Note any of the following events (each an "Event of Default") shall occur: (1) Maker fails to pay any interest or principal when due hereunder, and such failure to pay is not cured within ten (10) days after Holder gives written notice to Maker of such failure to pay; (2) any voluntary or involuntary bankruptcy, liquidation, insolvency, readjustment of debt or other similar act or proceeding shall be commenced by or against Maker; (3) Maker shall apply for, or there shall be appointed a receiver, custodian or trustee for all or a substantial part of Maker's assets; (4) Maker shall make an assignment for the benefit of creditors; (5) Maker shall be unable to pay its debts generally as they become due; or (6) Maker breaches any of Maker's representations, warranties, or covenants; then, automatically upon the occurrence of (2), (3), (4) or (5), and at the election of Holder upon the occurrence of (1) or (6), the entire amount of unpaid interest and principal hereunder shall become due and payable immediately without diligence, presentment, protest, demand or notice of protest, demand, dishonor or nonpayment, all of which are expressly waived hereby.

Pursuant to the agreement with respect to the $146,500 transfer to petitioner, petitioner had an unconditional obligation to repay to CMC the $146,500 that it transferred to him.  That obligation of petitioner was, however, subject to a condition subsequent.  That is to say, if petitioner worked in CMC's medical practice for at least six months, CMC

- 10 -

**[*10]** agree[d] to forgive and cancel **one thirtieth** (1/30th) of Physician's Loan Repayment Amount [$146,500] * * * for each calendar month after the end of the Guarantee Period [six months] that Physician [petitioner] (1) remains in the full-time practice of medicine in the Community and geographic area served by Hospital, (2) maintains Medical Staff membership and privileges in good standing at Hospital, and (3) remains available for emergency room coverage for patients of Hospital's emergency room. Amounts forgiven, if any, (as well as any imputed income as required by law) will be reported on Form 1099 as prescribed by the Internal Revenue Service. Amounts paid in error to the physician will not be subject to forgiveness.

Pursuant to the physician's recruiting agreement, in particular the compensation guarantee with forgiveness agreement and the promissory note that were part of the physician's recruiting agreement, in 2009, during the first six months of petitioner's employment with CMC, CMC loaned $146,500 to him. Petitioner did not include the $146,500 loan in gross income for petitioners' taxable year 2009, and thus that amount was not taxed on disbursement to him during that year.

During 2009, CMC paid petitioner total nonemployee compensation of $4,876 and reported that nonemployee compensation in Form 1099-MISC that it issued to him for that year. CMC did not include the $146,500 loan in Form 1099-MISC or in another information return that it issued to petitioner for his taxable year 2009.

[*11] During 2010, CMC paid petitioner total nonemployee compensation of $53,414 and reported that nonemployee compensation in Form 1099-MISC that it issued to him for that year.

In February 2011, petitioner terminated his employment with CMC.

During 2011 and 2012, CMC did not pay petitioner any nonemployee compensation. CMC did not issue to petitioner Form 1099-MISC for his taxable years 2011 or 2012.

Pursuant to the physician's recruiting agreement, in particular the compensation guarantee with forgiveness agreement and the promissory note that were part of the physician's recruiting agreement, during 2012 petitioner made payments to CMC totaling $46,883.54 (petitioner's repayments) in repayment of the remaining balance of the $146,500 that CMC had loaned to him in 2009.

Petitioners included Schedule C, Profit or Loss From Business (2012 Schedule C), with their tax return for their taxable year 2012 (2012 return). In the 2012 return, petitioners showed "Total Tax" of $31,197. In the 2012 Schedule C, petitioners claimed petitioner's repayments of $46,883.54 as "Other expenses" (claimed 2012 Schedule C repayment expenses).

**[\*12]** Respondent issued a notice of deficiency to petitioners for their taxable year 2012 (notice). In that notice, respondent determined to disallow the claimed 2012 Schedule C repayment expenses of $46,883.54. Respondent also determined in the notice that petitioners are liable for their taxable year 2012 for the accuracy-related penalty under section 6662(a).

## OPINION

Petitioners bear the burden of establishing that the determinations in the notice are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Moreover, deductions are a matter of legislative grace, and petitioners bear the burden of establishing that they are entitled to any deduction claimed. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). That this case was submitted fully stipulated under Rule 122 does not change petitioners' burden of proof or the effect of a failure of proof. See Rule 122(b); Borchers v. Commissioner, 95 T.C. 82, 91 (1990), aff'd, 943 F.2d 22 (8th Cir. 1991).

We turn first to whether petitioners are entitled to the claimed 2012 Schedule C repayment expenses of $46,883.54. The resolution of that issue depends on whether the $146,500 that CMC transferred to petitioner during 2009 pursuant to the physician's recruiting agreement constitutes a loan. That is because, as petitioners acknowledge, a taxpayer is not entitled to deduct the repayment of a

[*13] loan.  See Brenner v. Commissioner, 62 T.C. 878, 883 (1974); Crawford v. Commissioner, 11 B.T.A. 1299, 1302 (1928).  Consequently, petitioners do not dispute that if we were to find that the $146,500 that CMC transferred to petitioner during 2009 constitutes a loan, they would not be entitled to the claimed 2012 Schedule C repayment expenses of $46,883.54.  They do dispute, however, respondent's position that the $146,500 in question constitutes a loan.

The determination of whether a transfer of funds constitutes a loan is a question of fact.  See, e.g., Fisher v. Commissioner, 54 T.C. 905, 909 (1970).  In order for a transfer of funds to constitute a loan, at the time the funds are transferred there must be an unconditional obligation (i.e., an obligation that is not subject to a condition precedent) on the part of the transferee to repay, and an unconditional intention on the part of the transferor to secure repayment of, the funds.  See, e.g., Haag v. Commissioner, 88 T.C. 604, 616 (1987), aff'd without published opinion, 855 F.2d 855 (8th Cir. 1988); Dickinson v. Commissioner, T.C. Memo. 2014-136, at *10-*11.

Whether a transfer of funds constitutes a loan may be inferred from factors surrounding the transfer, including the existence of a debt instrument, the existence of a written loan agreement, the provision of collateral securing the purported loan, the accrual of interest on the purported loan, the solvency of the

**[\*14]** purported borrower at the time of the purported loan, the treatment of the transferred funds as a loan by the purported lender and the purported borrower, a demand for repayment of the transferred funds, and the repayment of the transferred funds. See, e.g., Haag v. Commissioner, 88 T.C. at 616 n.6; Clark v. Commissioner, 18 T.C. 780, 783 (1952), aff'd per curiam, 205 F.2d 353 (2d Cir. 1953); McFadden v. Commissioner, T.C. Memo. 2002-166, 2002 WL 1424637, at \*8.

Various factors surrounding the transfer during 2009 by CMC to petitioner of $146,500 indicate that that transfer of those funds constitutes a loan, including the following: petitioner executed a promissory note in which he agreed to repay to CMC all amounts that CMC transferred to him and that the compensation guarantee with forgiveness agreement referred to as the "Loan Repayment Amount" (i.e., $146,500); there was a loan agreement with respect to CMC's transfer to petitioner of the $146,500 in question that comprised the recruiting agreement, the compensation guarantee with forgiveness agreement, and the promissory note; petitioner agreed to pay interest on the $146,500 that he received from CMC at the rate specified in that note; petitioner agreed to secure the repayment of the $146,500 loan and the interest thereon by granting CMC a security interest in all accounts receivable of his private practice of medicine;

[*15] petitioner had the ability to repay the $146,500 that CMC transferred to him; petitioner in fact repaid the $146,500; and petitioner and CMC treated the $146,500 that CMC transferred to petitioner as a loan in that CMC did not include the $146,500 loan in Form 1099-MISC or in any other information return that it issued to petitioner for his taxable year 2009 and petitioner did not include the $146,500 in gross income for petitioners' taxable year 2009.

In the face of the various factors set forth above, which indicate that the $146,500 transfer to petitioner by CMC constitutes a loan, petitioners nonetheless take the position that the $146,500 that petitioner "received * * * from CMC should be considered an advance payment of Dr. Salloum's salary made pursuant to the Physician Recruiting Agreement", not a loan. We find petitioners' position that the $146,500 that CMC transferred to petitioner during 2009 does not constitute a loan to be inconsistent with the first stipulation of facts. In that stipulation, petitioners and respondent agreed, inter alia, that "CMC agreed to loan Mr. Salloum $146,500" and that "Mr. Salloum received the $146,500 loan within the first six months of his employment at CMC, which occurred in 2009."[4]

In support of their position, petitioners contend that "there is no uncondi-tional obligation [imposed on petitioner] to repay the amount [i.e., $146,500]

---

[4]See supra note 3.

[*16] extended to" him.  That is because, according to petitioners, "[a]ny repayments of * * * [the $146,500] would only become due if the Petitioner[] materially breached the Physician Recruiting Agreement."  As we understand the core of petitioners' argument in support of their position that the $146,500 that CMC transferred to him does not constitute a loan, petitioners are contending that petitioner's obligation to repay the $146,500 that CMC transferred to him was subject to a condition precedent and consequently his obligation to repay that amount to CMC was not unconditional.

In advancing their position, petitioners rely on the following language in the compensation guarantee with forgiveness agreement:

> H.  Any failure by Physician to comply with the terms of Paragraph E of this Addendum shall be considered a material breach of this Addendum and the Recruiting Agreement by Physician and shall authorize Hospital, at its option, to pursue the remedies described in the <u>Material Breach</u> Section of the Recruiting Agreement.

According to petitioners, "[w]hen Dr. Salloum terminated his employment with CMC, any unearned advanced amounts became due to CMC."

Petitioners' reliance on only Paragraph H. in the compensation guarantee with forgiveness agreement ignores other pertinent provisions in the agreement with respect to the $146,500 transfer to petitioner.  For example, the compensation guarantee with forgiveness agreement also contained the following provisions:

**[*17]** A.  Hospital [CMC] hereby agrees to loan Physician [petitioner] certain amounts of money which Hospital shall advance as a guarantee of compensation for Physician totaling a maximum of $146,500.00 (hereinafter the "Guarantee Amount").  * * *

\*          \*          \*          \*          \*          \*          \*

E.  Physician agrees to actively engage in the full-time practice of medicine in the Community and geographic area served by Hospital, to bill all patients and third-party payors promptly for all services rendered, and to use his/her best efforts to collect all patient accounts. Hospital shall have the right to review and audit Physician's books and records for whatever period of time is necessary to assure compliance with the Recruiting Agreement and any Addenda thereto.

F.  At the end of the Guarantee Period, the sum of all Guarantee Payments made by Hospital to Physician during the Guarantee Period, not otherwise repaid or recouped pursuant to any other provision in this Addendum [compensation guarantee with forgiveness agreement], shall be calculated.  This amount represents the "Loan Repayment Amount" which shall be due and payable by Physician as evidenced by the attached Promissory Note (Exhibit "A") executed by Physician.  Although not included in the Loan Repayment Amount, additional amounts may be due from Physician to Hospital in accordance with the terms of the Addenda attached and made a part of the Recruiting Agreement.  Interest on the Loan Repayment Amount will begin to accrue at the end of the Guarantee Period. However, in an effort to encourage prompt payment, interest will be forgiven on any amounts repaid within six (6) months of the end of the Guarantee Period.  Amounts so forgiven, if any, (as well as any imputed income as required by law) will be reported on Form 1099 as prescribed by the Internal Revenue Service.

G.  Notwithstanding, in recognition of the fact that Physician is establishing his/her full-time medical practice in the Community and geographic area served by Hospital and to encourage Physician to remain in the Community and geographic area served by Hospital

**[*18]** beyond the Guarantee Period, Hospital agrees to forgive and cancel **one thirtieth** (1/30th) of Physician's Loan Repayment Amount as calculated above to Hospital for each calendar month after the end of the Guarantee Period that Physician (1) remains in the full-time practice of medicine in the Community and geographic area served by Hospital, (2) maintains Medical Staff membership and privileges in good standing at Hospital, and (3) remains available for emergency room coverage for patients of Hospital's emergency room. Amounts forgiven, if any, (as well as any imputed income as required by law) will be reported on Form 1099 as prescribed by the Internal Revenue Service. Amounts paid in error to the physician will not be subject to forgiveness.

We have found that pursuant to the agreement with respect to the $146,500 transfer to petitioner petitioner had an unconditional obligation to repay to CMC the $146,500 that it transferred to him. That obligation of petitioner was, however, subject to a condition subsequent. That is to say, if petitioner worked in CMC's medical practice for at least six months, CMC

> agree[d] to forgive and cancel **one thirtieth** (1/30th) of Physician's Loan Repayment Amount [$146,500] * * * for each calendar month after the end of the Guarantee Period [six months] that Physician [petitioner] (1) remains in the full-time practice of medicine in the Community and geographic area served by Hospital, (2) maintains Medical Staff membership and privileges in good standing at Hospital, and (3) remains available for emergency room coverage for patients of Hospital's emergency room. Amounts forgiven, if any, (as well as any imputed income as required by law) will be reported on Form 1099 as prescribed by the Internal Revenue Service. Amounts paid in error to the physician will not be subject to forgiveness.

**[\*19]** Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that the $146,500 that CMC transferred to petitioner during 2009 was not a loan. Petitioners do not dispute that if we were to find that the $146,500 that CMC transferred to petitioner during 2009 constitutes a loan, they would not be entitled to the claimed 2012 Schedule C repayment expenses of $46,883.54.

We address now the accuracy-related penalty under section 6662(a) that respondent determined in the notice. That section imposes an accuracy-related penalty of 20 percent of the underpayment to which section 6662 applies. Section 6662 applies to the portion of any underpayment which is attributable to, inter alia, (1) negligence or disregard of rules or regulations, sec. 6662(b)(1), or (2) a substantial understatement of tax, sec. 6662(b)(2).

The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code. Sec. 6662(c). Negligence has also been defined as a failure to do what a reasonable person would do under the circumstances. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), aff'g T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), aff'd, 893 F.2d 656 (4th Cir. 1990). The term "negligence" also includes any failure by the taxpayer to keep adequate books and records or to substantiate

[*20] items properly.  Sec. 1.6662-3(b)(1), Income Tax Regs.  The term

"disregard" includes any careless, reckless, or intentional disregard.  Sec. 6662(c).

For purposes of section 6662(b)(2), an understatement is equal to the excess

of the amount of tax required to be shown in the tax return over the amount of tax

shown in the return.  Sec. 6662(d)(2)(A).  An understatement is substantial in the

case of an individual if the amount of the understatement for the taxable year

exceeds the greater of 10 percent of the tax required to be shown in the tax return

for that year or $5,000.  Sec. 6662(d)(1)(A).

The accuracy-related penalty under section 6662(a) does not apply to any

portion of an underpayment if it is shown that there was reasonable cause for, and

that the taxpayer acted in good faith with respect to, such portion.  Sec.

6664(c)(1).  The determination of whether the taxpayer acted with reasonable

cause and in good faith depends on all the pertinent facts and circumstances,

including the taxpayer's efforts to assess the taxpayer's proper tax liability, the

knowledge and experience of the taxpayer, and the reliance on the advice of a

professional, such as an accountant.  Sec. 1.6664-4(b)(1), Income Tax Regs.

Reliance on the advice of a professional may demonstrate reasonable cause

and good faith if, under all the circumstances, such reliance was reasonable and

the taxpayer acted in good faith.  Id.  In this connection, advice is defined as a

[*21] communication that reflects the adviser's analysis or conclusion. Woodsum

v. Commissioner, 136 T.C. 585, 593 (2011); see sec. 1.6664-4(c)(2), Income Tax

Regs. Moreover, in order for a taxpayer

> to rely reasonably upon advice so as possibly to negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. * * *

Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299

F.3d 221 (3d Cir. 2002).

A taxpayer's duty to file an accurate tax return generally may not be

avoided by the taxpayer's claim that he or she relied on a tax return preparer. See

Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662-663 (1987). Moreover, a

taxpayer's unconditional reliance on a certified public accountant (C.P.A.) does

not, standing alone, constitute reasonable reliance in good faith for purposes of

section 6664(c)(1) and the regulations thereunder. See Stough v. Commissioner,

144 T.C. 306, 323 (2015). A taxpayer has an obligation to exercise "[d]iligence

and prudence." Id. In addition, a taxpayer has a duty to read a tax return that a

C.P.A. prepares for the taxpayer. See id. Even if a taxpayer provided all the

[*22] information necessary to enable a C.P.A. to prepare an accurate tax return, the taxpayer still has a duty to read the tax return and make sure that it is accurate. See Magill v. Commissioner, 70 T.C. 465, 479-480 (1978), aff'd, 651 F.2d 1233 (6th Cir. 1981). A taxpayer's reliance on a tax return preparer with complete information regarding a taxpayer's business activities does not constitute reasonable cause if the taxpayer's cursory review of the tax return would have revealed errors. See Metra Chem Corp. v. Commissioner, 88 T.C. at 662. Furthermore, the mere fact that a C.P.A. prepared a tax return does not mean that he or she opined on any or all of the items reported in that return. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 100.

Respondent bears the burden of production with respect to the accuracy-related penalty under section 6662(a) that respondent determined in the notice. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). To satisfy respondent's burden of production, respondent must come forward with "sufficient evidence indicating that it is appropriate to impose" the penalty. See Higbee v. Commissioner, 116 T.C. at 446. Although respondent bears the burden of production with respect to the accuracy-related penalty under section 6662(a), respondent "need not introduce evidence regarding reasonable cause * * * or similar provisions. * * * [T]he taxpayer bears the burden of proof with regard to

**[*23]** those issues." Id. On the record before us, we find that respondent has carried respondent's burden of production under section 7491(c) with respect to the accuracy-related penalty under section 6662(a).

It is respondent's position that petitioners are liable for their taxable year 2012 for the accuracy-related penalty because there is a substantial understatement of tax for that year under section 6662(b)(2). In their 2012 return, petitioners showed "Total Tax" of $31,197. In the notice, respondent determined a deficiency of $16,923. We agree with respondent that there is a substantial understatement of tax for petitioners' taxable year 2012. See sec. 6662(d)(1) and (2)(A).

Petitioners argue, however, that they are not liable under section 6662(a) because they (1) are not "well-versed in the nuances of the tax law surrounding their claimed deductions" and (2) reasonably relied on the advice and the guidance of their C.P.A. when they reported in their 2012 return the claimed 2012 Schedule C repayment expenses of $46,883.54 that respondent disallowed in the notice. According to petitioners, under section 6664(c)(1) there was reasonable cause for, and they acted in good faith with respect to, the underpayment for their taxable year 2012.

[*24] Petitioners' 2012 return is not part of the record.[5]  We thus do not know whether petitioners retained someone to prepare or assist them in the preparation of that return, let alone whether any person that they may have retained was a C.P.A.  Moreover, the record is devoid of evidence regarding what, if any, information they gave to any C.P.A. that they may have retained and what, if any, advice any such C.P.A. may have given them with respect to the claimed 2012 Schedule C repayment expenses.  See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that there was reasonable cause for, and that they acted in good faith with respect to, the underpayment for their taxable year 2012.  On that record, we find that petitioners have failed to carry their burden of establishing that they are not liable for their taxable year 2012 for the accuracy-related penalty because of a substantial understatement of tax under section 6662(b)(2).[6]

---

[5]The record also is devoid of evidence with respect to the preparation of petitioners' 2012 return.

[6]Respondent argues in the alternative that petitioners are liable for their taxable year 2012 for the accuracy-related penalty under sec. 6662(a) because of negligence under sec. 6662(b)(1).  Because we have already held that petitioners

(continued...)

[*25] We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[6](...continued) are liable under sec. 6662(a) due to a substantial understatement of tax under sec. 6662(b)(2), we need not reach that alternative argument.